IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| ARTHUR LAUDMAN, IN HIS CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JEROME LAUDMAN, DECEASED, <br><br> Plaintiff, <br><br> vs. <br><br> ANTHONY PADULA, individually and/or in his official capacity as Warden for Lee Correctional Institution; JONATHAN GOODMAN, individually and/or in his official capacity; ANTHONY DAVIS, Individually and/or in his official capacity; GERTRUDE JENKINS, individually and/or in his official capacity; BRUCE OBERMAN, individually and/or in his official capacity; JAKE MCFADDEN, individually and/or in his official capacity; PAGET JAMES, individually and/or in his official capacity; HERMAN FINKLEA, individually and/or in his official capacity; ROY T. COOPER, individually and/or in his official capacity; DERRICK ANDERSON, individually and/or in his official capacity; and SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, <br><br> Defendants. | Civil Action No. 3:12-2382-SB-JRM <br><br><br><br><br><br><br><br><br><br><br> **REPORT AND RECOMMENDATION** |

The Plaintiff, Arthur Laudman, in his capacity as personal representative of the estate of Jerome Laudman, deceased ("Jerome") filed this action on August 20, 2012.[1] He filed his Amended Complaint on September 7, 2012. Plaintiff appears to assert claims under 42 U.S.C. § 1983 ("§ 1983"); Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131-12165; and under South Carolina law. Defendants are the South Carolina Department of Corrections

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02 (B)(2) DSC. Because these are dispositive motions, the report and recommendation is entered for review by the court.

("SCDC"), and SCDC employees Anthony Padula ("Padula"), Jonathan Goodman ("Goodman"), Anthony Davis ("Davis"), Gertrude Jenkins ("Jenkins"), Bruce Oberman ("Oberman"), Jake McFadden ("McFadden"), Paget James ("James"), Herman Finklea ("Finklea"), Roy T. Cooper ("Cooper"), and Derrick Anderson ("Anderson"). Defendant Oberman filed a motion to dismiss on November 6, 2012. Plaintiff filed a response on December 11, 2012, and Defendant Oberman filed a reply on December 28, 2012. The parties conducted limited discovery for the purpose of addressing statute of limitations issues. On July 15, 2013, Defendants filed a motion for summary judgment. Plaintiff filed a response on August 2, 2013, and Defendants filed a reply on August 12, 2013.

## FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

1. Jerome suffered from a variety of mental health conditions, including bipolar disorder, paranoid schizophrenia, and mental retardation. He was placed in SCDC custody in April 1998. SCDC counselors classified him as suffering from serious mental illness and needing mental health treatment. Amended Complaint, ECF No. 6, ¶ 11.

2. On June 20, 2005, the law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") filed a class action (the "Class Action") against SCDC (and others) in South Carolina state court, seeking declaratory and injunctive relief concerning alleged systemic deficiencies in SCDC's mental health program. Plaintiff's Opp. Mem., Ex. 1 (Affidavit of Daniel J. Westbrook), ECF No. 61-1, ¶ 2.

3. On January 11, 2006, the court in the Class Action entered a protective order limiting the disclosure of documents produced in discovery by SCDC that were marked confidential. Pursuant to that order, "restricted portions of medical records of an inmate may be shown to that inmate only upon consent of all parties or by court order." ECF No. 61-1, ¶ 4.

4. In 2007, SCDC transferred Jerome to Lee Correctional Institution ("LCI") in Bishopville, South Carolina. See Plaintiff's Opp. Mem., ECF No. 61 at 3. On December 7, 2007, SCDC placed Jerome on Crisis Intervention status because he was displaying severe mental health symptoms, including screaming, visual hallucinations, and appearing psychotic. Crisis Intervention is designed to "provide intensive inpatient mental health treatment for 'legitimate mental health care disorders or problems'..." for up to seven days. ECF No. 6, ¶ 17.

5. On January 11, 2008, Nelson Mullins served SCDC with a request for production which included a request to produce the medical records of 88 mentally-ill inmates, including Jerome. ECF No. 61-1, ¶ 6.

6. On February 7, 2008, SCDC transferred Jerome to the "Supermax" unit of LCI. During the cell extraction process from Crisis Intervention to Supermax, Defendant Davis gassed Jerome with chemical munitions and roughly threw him into a Supermax cell. Davis subsequently determined Jerome was placed in the wrong cell and roughly extracted him from the first cell and threw Jerome (while handcuffed) into another cell. ECF 6, ¶ 20.

7. Supermax is designed to punish and provide intensive supervision to inmates exhibiting assaultive behavior. In February of 2008, LCI Supermax was reported to be extremely cold and without a working heating system in place. Jerome was stripped of his mattress, sheets, blanket, socks, shoes, underwear, and uniform. ECF 6, ¶ 19.

8. On February 11, 2008, Jerome became seriously ill and in need of immediate medical and mental health attention as a result of being exposed to the cold temperatures. Defendant Cooper noticed that Jerome appeared to be "stooped over like he was real weak or sick." He

      considered notifying a unit captain or administrator about Jerome's condition, but his supervisor advised him against it. Other inmates requested medical assistance for Jerome, but the requests were denied. ECF 6, ¶ 23.

9. Jerome remained in the Supermax cell without clothing, blankets, or other items to maintain warmth for the next seven days. His mental health condition deteriorated dramatically. Jerome refused meals, ingested fecal matter, smeared fecal matter on himself, and remained nude on the concrete floor. ECF No. 6, ¶ 24.

10. Inmates in adjoining cells made repeated requests to Defendants James and Finklea to help Jerome. Both of these Defendants told the inmates the situation was "out of their hands." On February 14, 2008, an inmate asked Defendant Jenkins to help Jerome. She walked to Jerome's cell, observed him lying naked on the floor in an extremely sick condition, and subsequently told the inmate "don't worry about it, he'll be gone in a couple of days." ECF No. 6, ¶ 25.

11. By February 18, 2008, Jerome's mental and physical condition deteriorated. He experienced significant weight loss; numerous sores, cuts, and bruises; and mental incapacitation. During the afternoon of February 18, 2008, Nurse Jeri Andrews received a call from Supermax that Jerome was down. When she arrived at his cell, she observed that Jerome was on the floor face down in feces, urine, and vomit. Nurse Andrews noted that there was a terrible stench and there were at least fifteen to twenty food trays (containing molding/decaying food) between the cell doors. She noted that Jerome's breathing was shallow and he had movement in his arms. ECF No. 6, ¶ 26.

12. Defendant Goodman instructed an inmate to sweep the trays out of the doorway to Jerome's cell to allow the nurse access. Nurse Andrews advised Defendants Goodman and Anderson that Jerome needed to be removed from the cell so she could perform a physical examination and assessment. She offered them gloves and lab coats, but they adamantly refused to enter Jerome's cell and touch Jerome. Jerome remained lying naked on the concrete floor in near freezing conditions. ECF No. 6, ¶ 27.

13. Nurse Andrews asked other inmates to remove Jerome from his cell. Nurse Andrews examined Jerome and noticed he was extremely cold to the touch, "like ice all over his body." His blood pressure was 100/40 with a pulse of 50. SCDC encounter records indicated that Jerome was "unresponsive, with pupils fixed and dilated." ECF No. 6, ¶¶ 28-30.

14. Nurse Andrews had Jerome transferred to the medical unit "where the dried vomit and feces [were] cleaned from his body and his vital signs were assessed." ECF No. 6, ¶ 30.

15. At approximately 1:55 p.m., Nurse Andrews instructed medical to contact Emergency Medical Services and have Jerome transferred to Tuomey Hospital for examination and treatment. EMS personnel found Jerome to be cold and apneic when they arrived at LCI Supermax. Following Jerome's transport to Tuomey Hospital, Jerome's body core temperature was 80.6 degrees Fahrenheit. Physicians treated Jerome for hypothermia, but he went into cardiac arrest. CPR was initiated, but his condition had deteriorated, and he was pronounced dead at 6:49 p.m. on February 18, 2008. ECF No. 6, ¶ 31.

16. Jerome was forty-four years old at the time of his death. ECF No. 6, ¶ 9.

17. After Jerome's death, SCDC Inspector General Investigator Lloyd Greer ("Greer") began an investigation into "alleged misconduct and improprieties" regarding Jerome's death. ECF No. 6, ¶ 33.

18. The South Carolina Law Enforcement Division ("SLED") also began an investigation into Jerome's death. See ECF No. 61 at 7.

19. On February 18, 2008, an SCDC employee contacted Plaintiff (Jerome's uncle) to inform him of Jerome's death. Plaintiff inquired as to how Jerome died. The SCDC employee told Plaintiff "there was some seizure activity, but they would find out more after the autopsy was performed." Plaintiff's Dep., ECF No. 61-3 at 7-8. No one from SCDC called Plaintiff to give him any further information about the cause of Jerome's death. ECF No. 61-3 at 8.

20. After Jerome's funeral, the funeral home provided Plaintiff with a copy of the death certificate which listed the cause of death as "cardiac arrhythmia and cardiomegaly." It also listed the manner of death as "natural." Death Certificate, ECF No. 61-2. Plaintiff did not know what the terms cardiac arrhythmia and cardiomegaly meant. ECF No. 61-3 at 9.

21. By June of 2008, Investigator Greer finished his investigation and prepared a report referred to as the "Greer Report." Plaintiff alleges that the Greer Report identified the key roles that Defendants had in the period of time prior to Jerome's death, indicated Defendants were aware Jerome suffered from a serious medical condition and failed to provide Jerome with access to needed medical care, and showed that Defendants knew Jerome was confined in his cell in near freezing conditions without clothing or bedding. Additionally, Plaintiff claims the Greer Report discussed the alleged use of excessive force by Goodman during the cell extraction process. See Greer Report, ECF No. 61-4.

6

22. In February of 2009, SLED completed a preliminary inquiry and investigation into Jerome's death. See ECF No. 61 at 10. In a press release dated February 20, 2009, SLED advised that it referred Jerome's death investigation to the United States Attorney for the District of South Carolina for review of possible civil rights violations. The press release did not name any of the correctional officials allegedly involved in the potential rights violations. See SLED Press Release, ECF No. 61-5.

23. A local newspaper published an article about the SLED press release on or about February 20, 2009. At some time after the article was published, Plaintiff received a copy of the newspaper article in the mail. See Plaintiff's Supplemental Aff., ECF 61-7. Plaintiff read the article and within a few days went to the SLED office and talked with someone about it. ECF 61-3 at 14. Plaintiff called someone else within SLED and another phone number was given to him. No one from SLED or the other department called him back. He states he made three to four phone calls to SLED or the other agency. Id. at 14-17, 22.

24. Nelson Mullins did not receive the Greer Report until November 30, 2011. Because of the Amended Protective Order, the firm asserts it was prevented from disclosing the report to Plaintiff at that time. ECF No. 61-1, ¶¶ 16-17.

25. On April 23, 2012, after the restrictions of the Amended Protective Order were no longer in effect, Nelson Mullins attorney Daniel Westbrook ("Westbrook") contacted Plaintiff and informed him that Jerome's family may have a basis for recovering monetary damages. Plaintiff contacted Nelson Mullins and the law firm provided the Greer Report to him in May 2012. Plaintiff claims that, after reading the report, he for the first time learned that

Defendants played a substantial role in causing Jerome unnecessary suffering and ultimately Jerome's death. ECF No. 61-3 at 20-21.

**STANDARD OF REVIEW**

When considering a 12(b)(6) motion to dismiss, the court must accept as true the facts alleged in the complaint and view them in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999). The United States Supreme Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The moving party "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs,

945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the moving party carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

## **DISCUSSION**

Plaintiff alleges claims against all Defendants, pursuant to § 1983, for failure to provide medical care, cruel and unusual punishment, and excessive use of force. He also alleges claims against Defendant SCDC for a "pattern and practice" violation of civil rights pursuant to § 1983; gross negligence (survival and wrongful death) under South Carolina law; and a violation of the ADA. Defendant Oberman contends that his motion to dismiss should be granted because: (1) the applicable statute of limitations to maintain a cause of action for the violation of § 1983 has expired; (2) the matter should be dismissed as to Defendant Oberman in his official capacity as the issue is duplicative; and (3) this action should be dismissed against Defendant Oberman in his individual capacity as the Amended Complaint fails to allege any facts giving rise to a cause of action against him. Defendants contend that their motion for summary judgment should be granted because: (1) Plaintiff's § 1983 federal claims are time-barred by the applicable statute of limitations; (2) Plaintiff's state law claims are barred pursuant to the applicable statute of limitations; (3) Plaintiff fails to state a claim for alleged violations of the ADA and such claims are time-barred pursuant to the applicable statute of limitations; and (4) Defendant SCDC and the individual Defendants in their official capacities are not "persons" within the meaning of § 1983 and are therefore immune from suit pursuant to the Eleventh Amendment to the United States Constitution.

9

I.    § 1983 Claims

Defendant Oberman contends that his motion to dismiss should be granted because Plaintiff's claims are barred by the applicable statute of limitations and Plaintiff fails to state a claim against him. Defendants (including Defendant Oberman) argue that their motion for summary judgment should be granted as to Plaintiff's § 1983 claims because they are barred by the applicable statute of limitations, SCDC is entitled to Eleventh Amendment immunity, and the individual Defendants are entitled to Eleventh Amendment immunity in their official capacities.[2]

A.    Statute of Limitations

Defendants contend that Plaintiff's § 1983 claims are barred by the applicable statute of limitations. Plaintiff argues that the motion to dismiss and the motion for summary judgment should be denied because material questions of fact exist as to when his claims under § 1983 accrued against each Defendant. He asserts that his cause of action did not accrue as to any of the individual Defendants until receipt of the April 23, 2012 letter from Nelson Mullins and/or his receipt of the Greer Report in May 2012.

The parties do not dispute that the applicable statute of limitations for Plaintiff's § 1983 claims is found under South Carolina law. State law concerning limitation of actions applies in claims brought under § 1983. See Wilson v. Garcia, 471 U.S. 261 (1985), superseded by statute on other grounds, Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004); see also Burnett v. Grattan,

---

[2]In their reply (ECF 62 at 1, n.1), Defendants contend that Plaintiff's response should not be considered because it exceeds the 35-page limit applicable to such filings and Plaintiff did not request and receive permission to exceed the limit. See Local Civil Rule 7.05(B) DSC. Plaintiff's opposition memorandum is 37 pages long. Even if the arguments contained in the excessive pages are not considered (argument that the motion for summary judgment should be denied because SCDC is equitably estopped from asserting the statute of limitations), it would not change the recommendation contained herein.

10

468 U.S. 42 (1984); Owens v. Okure, 488 U.S. 235 (1989). In South Carolina, the statute of limitations for personal injury torts is generally three years. See S.C. Code Ann. § 15-3-530.

The parties, however, disagree as to when Plaintiff's claim accrued. Although a statute of limitations period is borrowed from state law, the question of when a civil right cause of action accrues remains a question of federal law. See Nasim v. Warden, Maryland House of Corr., 64 F.3d 951, 955 (4th Cir. 1995); Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975); see also Wallace v. Kato, 549 U.S. 384, 388 (2007). Under federal law, a cause of action accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim, 64 F.3d at 955; see United States v. Kubrick, 444 U.S. 111, 122-24 (1979).

When there is a dispute over the facts related to the limitations period, the issue must ultimately be resolved by a trier of fact. See Brown v. American Broadcasting Co., Inc., 704 F.2d 1296, 1304 (4th Cir.1983) ("[T]he issue of when plaintiff knew, or reasonably should have known of the existence of her cause of action, is a question to be resolved by a jury."). "Although the accrual date of a cause of action is a factual inquiry typically reserved for a jury, the district court may resolve that inquiry itself if the facts presented provide a clear basis for such a determination." Wood v. Commonwealth of Virginia, 155 F.3d 564, 1998 WL 414019, *2 (4th Cir. 1998)[Table](citing Brown, 704 F.2d at 1304).

Defendants first contend that Plaintiff's claim accrued on February 18, 2008 (the date of Jerome's death) when Plaintiff was told by someone at SCDC[3] that "there was some seizure activity,

---

[3]Defendants also infer that SCDC Chaplain Kimberly Campbell ("Campbell") told Plaintiff about Jerome's death. See Defendants Memorandum in Support of Summary Judgment, ECF No. 57-1 at 6. In her deposition, however, Campbell merely replied "Correct" to the question "So you would've spoken with someone from the family on the 18th?" Campbell Deposition, ECF No. 57-6
(continued...)

11

but they would find out more after the autopsy was performed." See ECF No. 61-3 at 7-8. Defendants argue that Plaintiff should have known about a possible cause of action because Jerome was only forty years old, Plaintiff did not think that the seizure disorder was life threatening, and Plaintiff had possible questions about whether Jerome was getting his medication (but did not ask anyone about it). See ECF No. 57-8 at 10, 17. Plaintiff, however, asserts it was reasonable for him to believe the SCDC representative was telling the truth because Jerome had a long history of seizures, people in their forties do die from seizures, and three of Jerome's four siblings (including his twin brother) predeceased him by three to ten years due to a variety of ailments. See ECF No. 61-3 at 3-4.

Defendants also argue that Plaintiff should have known he had a claim approximately two weeks after Jerome's death, when Plaintiff received a copy of the death certificate. They argue that because the death certificate provided Jerome's cause of death was cardiac arrhythmia and cardiomegaly, Plaintiff should have been on notice he had a cause of action as these reasons differed from what he was told on the day of Jerome's death. Plaintiff argues that the information on the death certificate did not necessarily conflict with what he learned earlier because he was told Jerome had some seizure activity, but they would find out more after the autopsy was performed. See ECF 61-3 at 28. Additionally, the death certificate had "natural" checked as to "Manner of Death" (see Certificate of Death, ECF No. 61-2) and there was nothing in it that caused Plaintiff to question what SCDC told him. See ECF 57-8 at 20; ECF 61-3 at 9.

---

[3](...continued)
at 5. Defendants also appear to assert that Campbell contacted Plaintiff based on a Medical Emergency or Death of an Inmate" form. The form indicates that the medical information about Jerome was "Seizure in S.M.U. - D-C sepsis." The form does not list Plaintiff as a contact, such that there is no indication from it that Plaintiff was contacted by Campbell or was provided with the information contained in the form. See ECF No. 57-7.

12

Defendants next argue that Plaintiff's claims accrued by December 31, 2008 (as Plaintiff testified he recalled receiving a mailing sometime in 2008 that contained a newspaper clipping stating SLED was investigating Jerome's death)[4] or after the publication of a press release by SLED on February 20, 2009. Plaintiff argues that he was prompt in investigating whether he had a claim after receiving this information. He asserts he drove to a SLED office and attempted to obtain information and made multiple telephone calls to SLED and/or another agency, but was rebuffed from receiving any further information as to the investigations. He testified that his messages were not returned.[5] See ECF No. 61-3 at 14-19, 22.

Viewed in the light most favorable to Plaintiff, genuine issues of material fact exist as to when he possessed sufficient facts about the harm done such that reasonable inquiry would have revealed the cause of action.[6] There is an issue of fact as to whether Plaintiff possessed sufficient facts based

---

[4]Plaintiff states in his supplemental affidavit (dated July 31, 2013) that after further study of the February 20, 2009 SLED press release, he believes it was more likely than not that the newspaper clipping he received referenced the SLED press release and he received the letter sometime after February 20, 2009. He also asserts that neither party has produced any newspaper clipping from 2008. Plaintiff's Supplemental Aff., ECF No. 61-7, ¶¶ 7-8.

[5]Defendants also contend that Plaintiff was put on inquiry notice of his claims in April 23, 2009, when Nelson Mullins received part of Jerome's medical records as part of the Class Action discovery. Westbrook provides that these documents were stamped confidential. As noted above, the court in the Class Action entered a protective order in January 2006 limiting disclosure of documents produced in discovery that were marked confidential. Additionally, Nelson Mullins asserts it did not represent Jerome at that time as he was deceased and no longer a member of the class. See Westbrook Aff., ECF No. 61-1, ¶¶ 8 and 17.

[6]Plaintiff appears to argue that any further inquiry would have been fruitless based on the experience of Nelson Mullins in attempting to obtain documents for use in the Class Action. On July 21, 2008, Nelson Mullins served a request for production which contained a request to produce "all documents related to investigations by the Inspector General/Division of Investigations since January 1, 2005 in which a mentally ill inmate was an alleged victim at Lee, Lieber, or Perry [Correctional Institution]." In September, Nelson Mullins filed a motion to compel regarding this request for production. In response, SCDC produced a list of 93 inmate files, but the list did not include or
(continued...)

on the information provided shortly after Jerome's death. There is also a question of fact as to whether the SLED press release or newspaper article put Plaintiff on notice that he had a cause of action and whether a reasonable inquiry based on that information would have revealed a cause of action.

    B.  <u>Defendant Oberman</u>

    At the time of the alleged incidents, Defendant Oberman was the Supermax Administrator at LCI. Oberman contends that this action should be dismissed against him in his individual capacity as the Amended Complaint fails to allege any facts giving rise to a cause of action against him. He asserts that aside from identifying him as the Administrator for LCI; the only factual allegation against him concerns conditions prior to Jerome's transfer to Supermax (in an interview after Jerome's death, Oberman reported that Jerome was transferred to Supermax because Jerome had trashed his room, was uncooperative, and paraded around naked, but Oberman did not know who requested or gave authority to place Jerome in Supermax). Oberman argues that the Amended Complaint is devoid of any factual allegation of an act or omission by him other than a conclusory statement. He also argues that Plaintiff fails to establish a prima facie case of supervisory liability. Oberman contends that the pleading only offers "labels and conclusions" against him in his individual capacity in violation of the standards set forth in <u>Twombly</u> and <u>Iqbal</u>. Plaintiff argues that

---

  [6](...continued)
reference Jerome. Nelson Mullins provides it did not learn of the press release until March 5, 2010, when one of its paralegals discovered it online. On August 3, 2010, Nelson Mullins served SCDC with another request for production which included a request to produce documents related to the deaths of mentally ill inmates in segregation. No reports or related documents were produced. On November 30, 2011, SCDC made available all Inspector General investigative files SCDC claimed were responsive to the prior request for production. None of the documents made mention of Jerome. Nelson Mullins then specifically requested documents about Jerome, and SCDC produced the Greer Report to Nelson Mullins. ECF No. 61-1, ¶¶ 7, 9, 10, 12, 16, 17.

he has stated a claim against Oberman directly as to Jerome's medical care and conditions of confinement, and a claim against Oberman based on supervisory liability.

Viewing the Amended Complaint in the light most favorable to Plaintiff for purposes of the motion to dismiss, Plaintiff has asserted a claim against Defendant Oberman that is plausible on its face. Plaintiff alleges that Jerome was subjected to excessive force in the Supermax Unit, was subjected to unconstitutional conditions of confinement including lack of a working heating system and extremely unsanitary conditions, and a lack of medical care. Although Plaintiff does not specifically delineate Oberman's actions or inactions, Plaintiff alleges that all of the individual defendants "had sufficient knowledge of [Jerome's] condition," "acted in blatant disregard of his health and life,"and "acted with conscious and deliberate indifferent to [Jerome's] basic and serious needs." ECF No. 6, ¶ 36. He alleges that Jerome was under twenty-four hour supervision by the individual Defendants, but they "consciously failed to secure necessary medical attention and care [for Jerome]." Id., ¶ 23. Additionally, Plaintiff alleges that the individual Defendant "had direct contact with [Jerome], had direct knowledge of his physical condition (including the need for urgent medical care), and/or supervised other Defendants who had direct contact with the decedent." Id., ¶ 8.

          C.      Eleventh Amendment Immunity

Defendants contend that, as to Plaintiff's § 1983 claims, Defendant SCDC and the individual Defendants in their official capacities are immune from suit under the Eleventh Amendment for claims for monetary damages in this Court. In his opposition memorandum, Plaintiff states he does not oppose Defendants' motion for summary judgment as to the § 1983 claims against Defendants in their official capacities. ECF No. 61 at 2, n. 1.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution. Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state. In the case of Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity [cites omitted] or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

Id. at 66.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments, and officials are entitled to the Eleventh Amendment immunity. Id. at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself and, therefore, against the state. State officials may only be sued in their individual capacities. Thus, Defendants are entitled to Eleventh Amendment immunity from monetary damages in their official capacities.

    II.      State Law Claims

Plaintiff alleges state law claims against Defendant SCDC. The parties appear to concede that Plaintiff's claims under South Carolina law are governed by the South Carolina Tort

16

Claims Act ("SCTCA"), S.C. Code Ann. §§ 15-78-10 et seq.,[7] and such claims are subject to a two-year statute of limitations (see S.C. Code Ann. § 15-78-110). They, however, disagree as to the accrual date of these claims. Defendants argue that the statute of limitations period applicable to Plaintiff's state law claims began to run on the date he was notified of Jerome's death (February 18, 2008). Plaintiff argues that his state law claims did not accrue until he received the letter from Nelson Mullins in April 2012 and/or the Greer Report in May 2012.

Defendants contend that the SCTCA defines "death" as a "loss"[8] and thus the statute of limitations began to run on the date Plaintiff was notified of Jerome's death. Citing Bayle v. South Carolina Dep't of Transp., 542 S.E.2d 736 (S.C.Ct. App. 2001), Defendants argue that the statute of limitation begins to run from the date the death was, or should have been discovered. In Bayle, the court found that the plaintiff was on notice of the loss (the death of his wife in a car accident in which she struck a puddle of water on a highway, crossed a median that had no barrier, and was hit by an on-coming tractor-trailer) on the date of her death rather than when he learned of a possible defect in the road surface. The South Carolina Court of Appeals found that the cause of the loss was not an issue of material fact as the defect was evident when it rained, the evidence showed it was raining

---

[7] Defendant SCDC is a governmental entity entitled to the protections, immunities, and limitations on liability set forth in the SCTCA. The SCTCA "is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C. Code Ann. §15-78-200.

[8] The SCTCA provides:
Except as provided for in Section 15-3-40, any action brought pursuant to this chapter is forever barred unless an action is commenced within two years after the date the **loss** was or should have been discovered; provided, that if the claimant first filed a claim pursuant to this chapter then the action for damages based upon the same occurrence is forever barred unless the action is commenced within three years of the date the loss was or should have been discovered.
S.C. Code Ann. §15-78-110 (emphasis added). "Loss" means bodily injury, disease, death, or damage to tangible property...." S.C. Code. Ann. § 15-78-30(f).

at the time of the accident, and the lack of a barrier on that portion of the highway was immediately apparent. Bayle, 542 S.E.2d at 742. In the present case, however, the alleged cause of Jerome's death was not readily apparent at the time of his death (when Plaintiff was told it was due to Jerome's asthma) or even at the time Plaintiff received a copy of the death certificate (listing cardiomegaly and cardiac arrhythmia as causes of death, but noting that the manner of death was "natural").

In determining the date on which a statute of limitations begins to run, South Carolina courts apply the discovery rule. According to the discovery rule, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered. Dean v. Ruscon Corp., 468 S.E.2d 645, 647 (S.C. 1996); see also S.C. Code Ann. § 15-78-110 ( A claim accrues under the SCTCA when "the loss was or should have been discovered."). The statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct. Id. The South Carolina Supreme Court has interpreted the "exercise of reasonable diligence" to mean that the injured party must act with some promptness where the facts and circumstances of an injury place a reasonable person of common knowledge and experience on notice that a claim against another party might exist. Id. The fact that the injured party may not comprehend the full extent of the damage is immaterial. Id.

Here, there is conflicting evidence as to when Plaintiff knew or should have known he had a cause of action. There is a genuine issue of material fact as to when Jerome's death as a result of the alleged wrongful conduct may have been discovered by the exercise of reasonable diligence.

III.    ADA Claims

As noted above, Plaintiff asserts a claim under Title II of the ADA against Defendant SCDC. SCDC contends that Plaintiff fails to state a claim under the ADA and any such claim is

time-barred pursuant to the applicable statute of limitations. Plaintiff, in his opposition memorandum, states that he does not oppose the motion for summary judgment on the ADA claim. ECF No. 61 at 2, n. 1. It is, therefore, recommended that Defendants' motion for summary judgment be granted as to Plaintiff's ADA claim.

## **CONCLUSION**

Based on review of the record, it is recommended that Defendant Oberman's motion to dismiss (ECF No. 23) be granted as to claims against him in his official capacity, and that the motion be denied in all other respects. It is also recommended that Defendants' motion for summary judgment (ECF No. 57) be granted as to Plaintiff's ADA (Fifth Cause of Action) claim, Plaintiff's § 1983 claims against SCDC, and Plaintiff's § 1983 claims against the individual Defendants in their official capacities. It is recommended that the motion be denied in all other respects.

Joseph R. McCrorey
United States Magistrate Judge

August 22, 2013
Columbia, South Carolina